Karluk M. MAYWEATHERS; Dietrich J. Pennington; Jesus Jihad; Terrance Mathews; Aswad Jackson; Ansar Kees, individually and on behalf of all others similarly situated, Plaintiff,

v.

Calvin TERHUNE; A.C. Newland; Barry Smith; Bonnie Garibay; N. Fry; M.E. Valdez; N. Bennett; and F.X. Chavez, Defendants.

No. CIV. S–96–1582LKKGGH.

United States District Court,
E.D. California.

June 25, 2004.

Susan Dee Christian, Prison Law Office, General Delivery, San Quentin, CA.

Karluk M Mayweathers, Calipatria State Prison, Calipatria, CA.

Tami M Warwick, Attorney General's Office for the State of California, Sacramento, CA.

John K Vincent, United States Attorney, Sacramento, CA.

Marc D Stern, Not Edca Admitted, American Jewish Congress, New York City.

*ORDER*

KARLTON, Senior District Judge.

This matter comes before the court on plaintiffs' motion for summary judgment and for a permanent injunction. I decide the motion on the basis of the papers and pleadings filed herein and after oral argument.

## I.

## BACKGROUND

Plaintiffs are a class of Muslim state prisoners housed at California State Prison–Solano seeking relief under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc *et seq.*, and under 42 U.S.C. § 1983, for alleged violations of their First Amendment right to the free exercise of their religion, as well as their Fourteenth Amendment right to equal protection of the law.

Each of plaintiffs' alleged violations has either been addressed by a settlement agreement between the parties or is subject to a preliminary injunction that has been continued by stipulation pending the ruling on the instant motion. The present motion seeks to make the stipulated injunctive relief permanent.

This court has issued fifteen preliminary injunctions in this case since July 31, 2001, with defendants unsuccessfully appealing all but one. Following the Ninth Circuit's decision to uphold RLUIPA and the Supreme Court's denial of defendants' petition for *certiorari*, the parties stipulated to the continued operation of the previously-ordered injunctive relief pending a final decision by this court. The relevant facts in this case have remained essentially unchanged throughout the course of this litigation and are set forth in detail in the previous orders of this court and the Ninth Circuit.

## A. PROCEDURAL HISTORY

Several individual and group complaints were filed by the Muslim inmates at California State Prison at Solano in 1995 and 1996. On October 16, 1997, the court appointed counsel for the plaintiffs. The actions were consolidated and a class action was certified on November 19, 1998.

Originally, plaintiffs sought relief with respect to several claims reflecting a variety of requests for accommodation of the plaintiffs' practice of Islam. An order filed on June 5, 2000, memorialized and confirmed settlement agreements reached on all issues except plaintiffs' request to attend Jumu'ah services and to wear half-inch beards without being disciplined or subjected to the loss of any sentence-reducing ("work time" or "good time") credits to which they may otherwise be entitled.

Plaintiffs' claims of violation of their religious freedom originally proceeded under the standards set forth in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The first three preliminary injunctions, all for Jumu'ah attendance, were granted under the *Turner* standard and affirmed by the Ninth Circuit. *Mayweathers v. Newland*, 258 F.3d 930 (9th Cir.2001). Plaintiffs' original motion for preliminary injunction on the grooming issue was denied under the *Turner* standard.

In September 2000, President Clinton signed the RLUIPA into law. Shortly thereafter, the court granted plaintiffs leave to amend in order to add a RLUIPA claim. Defendants moved to dismiss the RLUIPA claim, arguing that the statute is unconstitutional. On July 2, 2001, this court found the act to be constitutional and denied defendants' motion to dismiss.

Defendants appealed the order to the Ninth Circuit. As set forth below, defen-

dants also appealed preliminary injunctions four through ten concerning Jumu'ah, and the first four of the five preliminary injunctions concerning grooming. All of those appeals were based only on defendants' challenge to the constitutionality of RLUIPA. Consequently, all were either consolidated with the RLUIPA appeal or were stayed pending the outcome thereof. On December 27, 2002, the Ninth Circuit upheld the constitutionality of RLUIPA and thereby affirmed the preliminary injunctions.[1] *Mayweathers v. Newland,* 314 F.3d 1062 (9th Cir.2002). Defendants' petition for rehearing *en banc* was denied. Defendants then filed a certiorari petition in the Supreme Court, which was also denied. *Alameida v. Mayweathers,* — U.S. ——, 124 S.Ct. 66, 157 L.Ed.2d 30 (2003).

## B. JUMUA'AH ATTENDANCE

CSP–Solano is a medium security prison about thirty-five miles southwest of Sacramento. The vast majority of inmates are enrolled in the prison's work incentive program, in which every day of participation may reduce their sentences by one day. Under the relevant prison regulations, all able-bodied prisoners, including plaintiffs, are required to work or attend class. Cal. Code Regs., tit. 15, § 3040(a). Plaintiffs' work or class assignments are made by prison staff "with or without the inmate's consent." *Id.* at § 3040(c) & (f).

If inmates miss work without the approval of their supervisors, they receive an unexcused absence, known as an "A day," which can be grounds for discipline. Being late or "absent without authorization from a work or program assignment" is an "administrative rule violation," *id.,* at § 3314(a)(d)(H), and "[r]efusal to perform work or participate in a program as ordered or assigned" is a "serious rule vi-

olation." *Id.* at § 3315(a)(3)(J). The punishment for such violations includes suspension of privileges, confinement to quarters, forfeiture of up to thirty days of sentence credits, change in work incentive program eligibility, and transfer to a higher level prison. *Id.* at § 3314(e), 3315(f), 3323(h), 3375.

According to Muslim scholars and imams who have offered evidence on behalf of the plaintiffs, attendance at the Friday Sabbath services known as Jumu'ah is commanded by the Qur'an, and the services must be held collectively under the leadership of an imam. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 345, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) ("Jumu'ah is commanded by the Koran and must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer."); Hamdani Depo. at 39:8–16. Plaintiffs assigned to work or class on Friday are not allowed to leave their assignments to attend Jumu'ah. Cal. Code Regs., tit. 15, § 3041(b). Plaintiffs who leave their work or class assignments to attend Jumu'ah have been, and without injunctive relief may in the future be, subjected to progressive discipline resulting in the imposition of numerous penalties and loss of privileges. 15 Cal.Code Regs., tit. 15, §§ 3044, 3315(a)(3)(j), 3315(a)(3)(f); Matthews Depo. at 103:4–105:9; Pennington Depo. at 15:6–17; Mayweathers Depo. at 76:9–19. Those plaintiffs who are entitled to earn sentence-reducing credits by working or going to class are denied those credits for each day that they leave for an hour to attend Jumu'ah. Cal.Code Regs., tit. 15, § 3045.2; Garner Decl.

Plaintiffs' first motion for preliminary injunction concerning Jumu'ah attendance was filed on October 21, 1999. Plaintiffs requested to be allowed to attend Jumu'ah

---

1. The appeals stayed pending the outcome of the main appeal were subsequently dismissed by the defendants, with no further challenge to the relief granted by this court.

without being disciplined, which was clarified as including protection from receiving progressive discipline and from denial of sentence-reducing "work time" or "good-time" credits. By order of July 31, 2000, the court adopted the magistrate judge's recommendations and granted the first preliminary injunction concerning Jumu'ah.

Every preliminary injunction in this action was subject to the automatic 90–day expiration provision of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a)(2). Plaintiffs have therefore filed numerous subsequent motions for identical relief over the course of the litigation. Defendants' argument that such repeated motions are barred by the PLRA was rejected by this court and affirmed by the Ninth Circuit. *Mayweathers v. Terhune*, 136 F.Supp.2d 1152 (E.D.Cal.2001); *aff'd, Mayweathers*, 258 F.3d at 936.

This court issued a second preliminary injunction on December 19, 2000, prohibiting defendants from imposing disciplinary action or the "forfeiture" of work time credits when plaintiffs attend Jumu'ah. After further briefing and additional oral argument, the court denied plaintiffs' request for the relief to be expanded to include prohibiting defendants from denying plaintiffs the opportunity to "earn" work time credits while they attend Jumu'ah. Plaintiffs' third motion for preliminary injunction, still under *Turner*, was granted March 30, 2001. Defendants appealed each of the first three injunctions regarding Jumu'ah. On August 2, 2001, the Ninth Circuit affirmed each of the injunctions. *Mayweathers*, 258 F.3d 930 (9th Cir.2001). The fourth motion for preliminary injunction was filed based upon both *Turner* and RLUIPA and was granted on July 5, 2001. The court expanded the relief and ordered as follows:

> [P]laintiffs are allowed to attend Jumu'ah services during the pendency of this action without receiving disciplinary action, forfeiting good-time credits, or losing the opportunity to earn good-time credits.
>
> Order of July 5, 2001.

All subsequent orders by the court granted this same injunctive relief. The court issued these orders based on the law of the case doctrine, finding that defendants had failed each time to respond to plaintiffs' further Jumu'ah motions with any new evidence or new legal argument that had not already been considered and rejected by the court. *Arizona v. California*, 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). Defendants appealed each of the fourth through tenth preliminary injunctions, challenging the constitutionality of RLUIPA in each appeal. All of the appeals were consolidated into one challenge of RLUIPA and all were denied. *Mayweathers*, 314 F.3d 1062. The Ninth Circuit's decision rejecting some appeals, and defendants' dismissal of others that had been stayed, resulted in affirmance of the fourth through tenth preliminary injunctions for Jumu'ah and the four grooming appeals.

Pending *en banc* review by the Ninth Circuit, and again following denial or certiorari by the Supreme Court, the parties stipulated to allow the Jumu'ah and grooming injunctive relief to continue without requiring the court to issue successive renewals under the PLRA. Defendants thus forfeited the opportunity to produce evidence in opposition to the plaintiffs' claims for injunctive relief. Thus, pursuant to court order, plaintiffs are currently being allowed to leave their assignments to attend Jumu'ah without being disciplined or being denied the opportunity to earn sentence-reducing credit.

## C. GROOMING POLICY

Plaintiffs have also challenged defendants' grooming policy. Wearing at least

a half-inch beard is an exercise of plaintiffs' religion. Hamdani Depo. at 69:4–6; Hasan Decl. at ¶¶ 3, 6. CDC grooming regulations prohibit plaintiffs from wearing beards of any length for religious purposes. Cal.Code Regs., tit. 15, § 3062(h). Plaintiffs have worn beards for religious purposes and have been, and without injunctive relief may in the future be, considered "program failures" and have been, and may be, subjected to progressive discipline. Cal.Code Regs., tit. 15, § 3062(m); Mayweathers Depo. at 14:3–15:19, 35:6–36:25, 81:7–88; Jihad Depo. at 68:18–69:18; 99:2–100:3.

Plaintiffs' original motion for preliminary injunction challenging defendants' grooming regulations was premised on the *Turner* standard. The court denied that motion on July 31, 2000. On September 13, 2001, plaintiffs filed a new motion for preliminary injunction to allow them to wear a half-inch beard, but this time they did so under RLUIPA. That motion was granted on February 8, 2002. Defendants appealed the injunction, based only on a challenge to the constitutionality of RLUIPA.

As with the Jumu'ah issue, plaintiffs filed subsequent motions for preliminary injunction on the grooming issue because each order expired automatically after 90 days. By order dated April 26, 2002, the court denied defendants' motion to stay enforcement of the first grooming injunction and granted plaintiffs' motion to renew the injunctive relief. Defendants appealed the second injunction, again challenging only the constitutionality of RLUIPA. Defendants appealed the third and fourth injunctions. The fifth grooming injunction was issued after the Ninth Circuit affirmed the constitutionality of RLUIPA. Defendants did not appeal this injunction, but rather, stipulated to the maintenance of the grooming preliminary injunctive relief without the need for successive motions pending their petition for rehearing *en banc* and their petition for certiorari. Once the petition for certiorari was denied, they stipulated to allow the grooming relief to continue pending final judgment. As with the Jumu'ah injunction, defendants continue to comply with the grooming injunction at this time.

## II.

## SUMMARY JUDGMENT STANDARDS UNDER FED. R. CIV. P. 56

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Sicor Limited v. Cetus Corp.*, 51 F.3d 848, 853 (9th Cir.1995).

Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322, 106 S.Ct. 2548. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. 2548.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *See also First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Sicor Limited,* 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed.R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 586 n. 11, 106 S.Ct. 1348; *See also First Nat'l Bank,* 391 U.S. at 289, 88 S.Ct. 1575; *Rand v. Rowland,* 154 F.3d 952, 954 (9th Cir.1998). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Owens v. Local No. 169, Assoc. of Western Pulp and Paper Workers,* 971 F.2d 347, 355 (9th Cir.1992) (quoting *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987)), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505; *see also Cline v. Industrial Maintenance Engineering & Contracting Co.,* 200 F.3d 1223, 1228 (9th Cir.2000).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank,* 391 U.S. at 290, 88 S.Ct. 1575; *See also T.W. Elec. Serv.,* 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments); *see also International Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.,* 752 F.2d 1401, 1405 (9th Cir.1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *See also In re Citric Acid Litigation,* 191 F.3d 1090, 1093 (9th Cir.1999). The evidence of the opposing party is to be believed, *see Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *see Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (*per curiam*)); *See also Headwaters Forest Defense v. County of Humboldt,* 211 F.3d 1121, 1132 (9th Cir.2000). Nevertheless, inferences are

not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd,* 810 F.2d 898, 902 (9th Cir.1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

## III.

### RLUIPA STANDARDS

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person ... is in furtherance of a compelling governmental interest [ ] and ... is the least restrictive means of furthering that compelling interest." 42 U.S.C. § 2000cc–1(a). The Act applies to any "program or activity that receives Federal financial assistance." 42 U.S.C. § 2000cc–1(b)(1) and (2).

To assert a claim under RLUIPA, plaintiffs must produce "prima facie evidence to support a claim alleging a violation of the Free Exercise Clause ...." 42 U.S.C. § 2000cc–2(b). The government, however, "shall bear the burden of persuasion on any element of the claim, except that plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." 42 U.S.C. § 2000cc–2(b).

RLUIPA further provides that it shall be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc–3(g).

In opposing plaintiffs' motion for a permanent injunction, defendants make a series of arguments that have consistently been rejected during the course of this litigation. Indeed, each of defendants' contentions are effectively foreclosed by law of the case, either because of a previous ruling of this court, or the Ninth Circuit, or both. Additionally, this court's recent decision on permanent injunctive relief in *Fenelon v. Riddle,* No. CIV–S–95–0954 LKK JFM, is virtually indistinguishable from the Jumu'ah claim at issue here.

As I explain below, defendants do make one new argument, and it is a serious one. Defendants contend that this court cannot grant injunctive relief which would expunge from plaintiffs' files any rules violation reports for attending Jumu'ah or failure to comply with grooming regulations. They argue that such relief, because it involves relief that would affect the length of plaintiffs' sentence, can only be resolved through a writ of habeas corpus. Before addressing this argument, I briefly touch on defendants' other contentions.

## IV.

### STANDING/ADEQUACY OF CLASS REPRESENTATIVES

■ First, defendants contend that the named class representatives may not seek injunctive relief because they have not demonstrated a substantial burden on their religious exercise insofar as they have not been disciplined for failure to comply with the challenged policies. Defendants' argument, though couched by defendants in terms of the RLUIPA "sub-

stantial burden" requirement, is in effect an attack on plaintiffs' standing to bring their claims. This court, however, has already addressed nearly identical arguments concerning the same named plaintiffs and has rejected them. *See* Order of March 30, 2001 at 6. As the court has previously explained, defendants' argument speaks to the effectiveness of the court's preliminary injunction, not the justiciability of the plaintiffs' claim. *See Friends of Earth, Inc. v. Laidlaw Environmental Services, Inc.,* 528 U.S. 167, 190, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ("[I]t is plaintiffs' burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrong behavior will likely occur or continue and that the threatened injury is certainly impending.") (citations and internal quotation marks omitted). Plaintiffs' uncontested proffer that they had been prevented from attending Jumu'ah prior to the issuance of the injunction suffices to establish their standing. The mere fact that the substituted class representatives, who were added as representatives after preliminary injunctive relief had been granted, have not been disciplined, does not suggest that they are inadequate as representatives. As the Ninth Circuit recently explained:

> The named plaintiffs either face or have faced the choice between following work incentive program rules and obeying the Qur'an. Prison officials do not argue that the named plaintiffs are somehow immune from having to work on Fridays in the future. The prisoners have standing to seek injunctive relief, and a holding to the contrary would allow prison officials to defeat prisoners' claims simply by changing individual plaintiffs' work schedules as soon as they file suit.

*Mayweathers v. Newland,* 258 F.3d 930, 934–935 (9th Cir.2001). The same logic addresses defendants' contention regarding discipline under the grooming regula-

tions. As plaintiffs' reply brief explains in detail, the court has already found all three class representatives adequate to challenge both the grooming and Jumu'ah policies, and defendants do not allege any permanent change in circumstances which would alter that conclusion.

## V.

## COMPELLING INTEREST/LEAST RESTRICTIVE MEANS

Defendants next raise a series of arguments seeking to justify the Jumu'ah and grooming policies as serving compelling interests such as security within the prison. Again, as plaintiffs point out, both this court and the Ninth Circuit have foreclosed precisely the same arguments. For purposes of the record on appeal, the court will once again briefly explain why defendants' arguments are not persuasive.

### A. GROOMING POLICY

Plaintiffs assert that their religion requires that they wear beards. It is uncontested that inmates who refuse to shave their beards in conformity with CDC grooming regulations are subjected to progressive penalties, culminating in placement on "C–Status," which prevents inmates from earning good-time credits. *See* Cal.Code Regs., tit. 15, §§ 3062(m) & 3315(f).

Defendants assert that the grooming regulations are necessary to identify inmates for the purpose of preventing escapes and controlling movement within the prison. They have previously tendered evidence that the grooming regulations were implemented in response to a number of escapes from different institutions after inmates altered their appearances. *See* Anthony Newland Depo. at 39:15–40:13; 62:13–65:3; 64:6–65:3. Defendants also submit that a beard of any length changes the appearance of a prisoner and compro-

mises the process of identifying inmates or escapees. Finally, defendants assert that correctional officers need to quickly identify inmates to prevent assaults, riots, or disturbances, and that without these amended regulations this process would become impossible if an inmate quickly changed his appearance by shaving his beard.

Throughout the course of this litigation, plaintiffs have responded to these arguments with evidence that the safety and security concerns tendered by defendants are largely exaggerated, and do not justify the imposition of grooming regulations prohibiting beards. Plaintiffs' expert, George Sullivan, who has more than forty years of experience in corrections, stated in his affidavit that he was unaware of any instance where an inmate escaped from prison solely by changing his appearance. *See* George Sullivan Dec. at ¶¶ 3, 12. Sullivan opined that the incidents of escape cited by CDC officials were taken out of context, without acknowledgment of the additional circumstances that permitted each escape. *Id.* Moreover, Sullivan averred that Section 3287(b) of the grooming regulation should alleviate defendants' concerns about identification since it requires "visual daily inspections ... to ensure compliance with departmental grooming standards." *See* George Sullivan Decl. at 13 (citing Cal.Code. Regs., tit. 15, § 3287(b)).

■ Defendants' rationale that an inmate with a beard can more easily alter his appearance after he escapes is not persuasive. Common sense and experience recognizes that a prisoner may not only shave, but alter his appearance in any number of ways to evade authorities after escape. Moreover, while it is plausible that altering a six inch beard, or cutting very long hair may assist an escapee to elude capture, I must agree with Judge Strand that shaving a half-inch beard like-

ly cannot. *See Luckette v. Lewis,* 883 F.Supp. 471, 481 (D.Ariz.1995) ("prison officials do not meet their burden of demonstrating a compelling interest for not allowing a short, kempt beard"); *Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir.1989) ("[i]t is certainly not irrational to believe that a full beard, which may well extend for significant lengths sideways from the cheeks as well as downwards from the chin, may impede identification more than a one-inch beard"). As Magistrate Judge Moulds concluded "[w]hen it comes to changing one's appearance through the growth or removal of hair, this court finds that not all beards are equal." *See* Findings and Recommendations, dated March 29, 2000, at 30:10–12.

Finally, I note that the defendants are not faced with the specter of prisoners constantly changing their appearance. Surely an inmate who grows a beard for assertedly religious reasons and then shaves without compulsion, provides evidence suggesting that the inmate does not have a legitimate religious conviction. *See Luckette,* 883 F.Supp. at 481. For the foregoing reasons, the court concludes that the prison grooming policy does not further a compelling governmental interest, and is therefore in violation of RLUIPA. *See* 42 U.S.C. § 2000cc–1(a).

■ Because I conclude above that the plaintiffs have made a sufficient showing that the regulations are an exaggerated response to defendants' security concerns, it follows that defendants have not demonstrated that the regulations are the least restrictive means of achieving a compelling governmental interest.

As explained above, the grooming regulations themselves provide one alternative. Section 3287(b) of Title 15 of the California Code of Regulations requires mandatory visual daily inspections of inmates' facial hair. These inspections should alleviate

concerns about an inmate's ability to engender confusion by radical alterations in appearance. Nor does the concern that escapees may change their appearance require a different result. Prison officials can address the risk of an inmate avoiding detection by shaving his beard by requiring two photographs of that inmate: one with his face clean shaven, and one with a half-inch beard. *Luckette*, 883 F.Supp. at 481 (finding that photographing an inmate with a short beard may make it easier to differentiate that inmate from others without beards); *see also Ross v. Coughlin*, 669 F.Supp. 1235, 1240–41 (S.D.N.Y.1987) (upholding an "initial shave" requirement to obtain a photograph of inmates without a beard to later assist in their identification if they shave their beards). Indeed, prior to the current grooming regulations, prison officials took additional photos of inmates who altered their appearance during incarceration through the growth of hair. *See* Findings and Recommendations, dated March 29, 2000, at 32:1–5. Defendants produce no evidence that resuming this practice would result in a significant cost to the institution.

Because there appear to be ready alternatives to the prohibition of beards, defendants have not used the least restrictive means of accomplishing its goals of prison security and easy identification of prisoners. *See Ashelman v. Wawrzaszek*, 111 F.3d 674, 677 (9th Cir.1997)("the existence of alternatives may be evidence that the [policy] is not reasonable but is an 'exaggerated response' to prison concerns.")

For the foregoing reasons, I conclude that the challenged grooming regulations, as they are applied to plaintiffs, violate RLUIPA.

## B. JUMU'AH ATTENDANCE

■ As with the grooming policy, defendants repeat their previously-rejected arguments with respect to Jumu'ah attendance. They argue that, even if the prison's polices impose a substantial burden on plaintiffs' exercise of religion, the defendants have a compelling interest in administering the Work Incentive Program because the program provides for safety and security in the prisons and prevents prison conditions from deteriorating. In particular, defendants argue that the WIP program accomplishes these objectives by keeping inmates engaged in productive, supervised activities and providing the prison with labor needed to prevent prison conditions from deteriorating.

If this were a traditional Free Exercise Clause challenge, it is doubtful that these asserted justifications would be sufficient to withstand scrutiny under *O'Lone* and *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). *See Mayweathers I*, 258 F.3d at 937–38 (holding prison policy of punishing inmates for missing work to attend Jumu'ah services was not rationally related to a legitimate penological purpose under *Turner*); *id.* at 938. ("As the discussion of the *Turner* factors shows, the inmates' likelihood of success on the merits is strong."). Under RLUIPA, however, defendants must meet an even higher standard. They must conclusively demonstrate that the policy "is in furtherance of a compelling governmental interest [and] is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a).

In *Mayweathers I*, the Ninth Circuit considered and rejected defendants' argument that the injunction in this case would interfere with the government's interest in making sure that inmates attend their work and education assignments. *See id.* at 938. Although the court found this to be a "legitimate interest" under *Turner*, the court ultimately found the justification insufficient because the injunction had not significantly altered the operation of the

prison's work program. The court found that the defendants had:

> utterly failed to show any ripple effect among inmates and staff from the narrow scope of the injunction. Prison administrators have implemented the injunction by logging inmates' unexcused absences as always; the only change is that unexcused absences attributable to Jumu'ah attendance are off bounds to the disciplinary process ... [T]he absence of Muslim inmates for about one hour on Fridays only will not disrupt the operation of the work incentive program.

*Id.* Defendants have presented no evidence suggesting that the situation within the prison has changed since the Ninth Circuit handed down its decision.

Even assuming that defendants' asserted interests in keeping prisoners occupied and using their labor for prison upkeep were sufficiently compelling, however, defendants have not demonstrated that the challenged policy with respect to Jumu'ah, in particular, is the least restrictive means to achieve those interests. Among the several reasonable alternatives suggested by plaintiff, the most obvious is the suggestion that the Warden grant a special exemption for attendance at Jumu'ah, such that missing work to attend Jumu'ah will not result in disciplinary action. Under the current regulations, some inmates may take as many as 16 hours off a month to receive visitors, attend special services, and go to certain recreation and entertainment events. *See* Cal.Code Regs., tit. 15, §§ 3045.2(b) & (e). Given the extensive set of secular exemptions to the prison work requirements, the policy of punishing inmates for one hour of weekly Jumu'ah attendance cannot be said to be the least restrictive means of achieving the state's asserted interest in instilling work ethic.

Finally, the Ninth Circuit's conclusion in *Mayweathers I* that the preliminary injunctive relief has caused only a "slight change from routine prison practices," *id.* at 938, cannot be reconciled with the notion that very same relief, if made permanent, would somehow result in serious disruption to the prison. For the foregoing reasons, the court finds that the prison's policy with respect to Jumu'ah attendance is in violation of RLUIPA.

## VI.

## EXPUNGEMENT OF DISCIPLINARY RECORDS

Finally, defendants take issue with the third prong of plaintiffs' proposed injunctive relief, which reads as follows:

> Defendants shall remove from the custody files of all past and current members of the plaintiff class, any and all documents reflecting disciplinary action or credit loss resulting from plaintiffs' attendance at Jumu'ah or from wearing beards for religious purposes.

Defendants take issue with this proposed relief on two grounds. First, they argue that the proposed injunction would violate the PLRA's standards for permanent injunctive relief. Second, they argue that the injunction would violate the rule of *Heck v. Humphrey,* 512 U.S. 477, 487, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), because it would have the effect of reducing the length of plaintiffs' sentences to the extent that the discipline in question involved the loss of credits. I address these arguments in turn.

The court may not grant prospective relief without making the specific findings required by the Prison Litigation Reform Act (PLRA). *See* 18 U.S.C. § 3626(a)(1). The PLRA provides that "[t]he court shall not grant or approve any prospective relief [with respect to prison conditions] unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal

right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.; see also Oluwa v. Gomez,* 133 F.3d 1237, 1239 (9th Cir.1998) ("We interpret the statute to mean just what is says—before granting prospective injunctive relief, the trial court must make the findings mandated by the PLRA.").

Under these standards, defendants raise two objections to the request. First, they argue that they are "not required to expunge all disciplinary actions that occurred prior to the Court issuing Plaintiffs preliminary injunctive relief and prior to RLUIPA." Second, they argue that "there is no method by which Defendants can identify all the past and current members of the Plaintiff class to determine which records need to be expunged." Def's Oppo. at 13.

## A. RETROACTIVE APPLICATION

With respect to retroactive effect, the statute is silent. *Orafan v. Goord,* 2003 WL 21972735 (N.D.N.Y. Aug 11, 2003) ("Unlike its predecessor, RLUIPA is silent as to its retroactive applicability."). In *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Supreme Court explained the approach courts should follow when determining the temporal application of new legislation. First, courts must begin with the statutory language to ascertain whether Congress prescribed the statute's temporal reach. *Id.* at 280, 114 S.Ct. 1483. If the statute is silent on such issue, as it is here, the court must then determine "whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* (*quoted in St. Cyr v. I.N.S.,* 229 F.3d 406, 413 (2d Cir.2000)). If application of the statute would have such a "retroactive effect," "then, in keeping with our 'traditional presumption' against retroactivity, we

presume that the statute does not apply to that conduct." *Martin v. Hadix,* 527 U.S. 343, 352, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999) (*quoting Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483); *see also Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (judicial default rules dictate, absent statutory language or other legislative intent to the contrary retroactivity is not favored in the law) (*cited in Landgraf,* 511 U.S. at 264, 114 S.Ct. 1483); *St. Cyr v. I.N.S.,* 229 F.3d at 413; *Mojica v. Reno,* 970 F.Supp. 130, 168 (E.D.N.Y.1997).

Applying these standards to RLUIPA, it is apparent that the statute is silent as to its temporal application and further, applying the statute retroactively would appear to attach new legal consequences with respect to past conduct. Pre–RLUIPA monetary damages, for instance, would clearly be precluded. It is less clear that these rules affect a request for injunctive relief, since the function of injunctive relief is directed to the future and not toward remediation of past wrongs. *See Landgraf,* 511 U.S. at 293, 114 S.Ct. 1483 (Scalia, J. concurring). For these reasons, prospective injunctive relief is ordinarily not considered retroactive, and courts have so held in the context of RLUIPA. *See Kikumura v. Hurley,* 242 F.3d 950, 960 n. 5 (10th Cir.2001)(holding that the application of RLUIPA was not retroactive where the plaintiffs sought injunctive relief); *Dilaura v. Ann Arbor Charter Twp.,* 30 Fed. Appx. 501, 509 (6th Cir.2002) ("Plaintiffs are seeking prospective relief [under RLUIPA] in the form of an injunction ordering the township to allow them to run their retreat house. Injunctive relief is prospective, not retroactive."). Here, however, the requested relief is intended not merely to prospectively bar defendants from violating plaintiffs' rights, but also to remedy past violations of plaintiffs' rights.

With respect to the beard policy, it can be said with confidence that relief would not have been available prior to the enactment of RLUIPA, since this court denied injunctive relief on that basis under the pre-RLUIPA *Turner* standard. With respect to the Jumu'ah policy, however, this court (and the Ninth Circuit) have already found that injunctive relief would be proper under the *Turner* standard as well. Thus, at least as to that issue, relief for wrongs predating RLUIPA would appear appropriate regardless of whether the statute has retroactive effect. This creates two regimes for disciplinary actions predating 2000: disciplinary actions due to Jumu'ah attendance are invalid, while disciplinary action due to contravention of the beards rule are not.

## B. ADMINISTRATIVE BURDEN

Defendants also raise a serious argument that it would be either difficult or impossible for them to locate all past and current members of the plaintiff class to determine which records need to be expunged. Unfortunately, defendants provide no evidence of any asserted administrative burden apart from the bald suggestion that it would be difficult to locate members of the plaintiff class, making it difficult for the court to devise an appropriate remedy that respects both the needs of the prison administrators and those of the plaintiffs.

Under the PLRA, the court must specifically find that the relief afforded extends no further than necessary to correct the threat to plaintiffs' rights under RLUIPA and, accordingly, that it is narrowly drawn and the least intrusive means necessary to correct the harm. Accordingly, the court will order the parties to propose an appropriate means of implementing the expungement of plaintiffs' disciplinary records.

## VII.

## HABEAS EXHAUSTION RULE

Finally, defendants object to the disciplinary expungement relief on the grounds that the proposed injunction, to the extent that it concerns the loss of credits that would affect the length of plaintiffs' sentences, may be accomplished only through a writ of habeas corpus. Defendants rely on *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), and its predecessor case, *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), in which the Supreme Court addressed the relationship between 42 U.S.C. § 1983 and the habeas statutes, 28 U.S.C. §§ 2241 and 2254. *Preiser,* 411 U.S. at 482, 93 S.Ct. 1827; *Heck,* 512 U.S. at 480, 114 S.Ct. 2364 ("This case lies at the intersection of two of the most fertile sources of federal-court prisoner litigation [§ 1983] and [the federal habeas corpus statutes]"). No court has yet considered the application of the *Heck-Preiser* rule to RLUIPA.

### A. *Preiser v. Rodriguez*

In *Preiser,* the plaintiffs were state prisoners who were deprived of good-time credits as a result of disciplinary proceedings and who brought suit under section 1983 alleging that prison officials had acted unconstitutionally in depriving them of the credits. 411 U.S. at 476, 93 S.Ct. 1827. The Court considered the potential overlap between section 1983 and the habeas statutes in such cases and held that habeas corpus provided the exclusive remedy for a state prisoner who challenged the fact or duration of his confinement and sought immediate or speedier release, even though his claim may otherwise come within the literal terms of § 1983.

The *Preiser* Court rejected the prisoners' claim that the broad language of sec-

tion 1983, which concededly encompassed their claims, should decide the issue:

> The broad language of § 1983, however, is not conclusive of the issue before us. The statute is a general one, and, despite the literal applicability of its terms, the question remains whether the specific federal habeas corpus statute, explicitly and historically designed to provide the means for a state prisoner to attack the validity of his confinement, must be understood to be the exclusive remedy available in a situation like this where it so clearly applies.

411 U.S. at 489, 93 S.Ct. 1827. Thus, the Court's reasoning hinged on the distinction between the generality of section 1983 and the specificity of the federal habeas statutes in addressing a means for attacking the validity of confinement.

Next, the Court observed that, in amending the habeas corpus law in 1948, Congress had imposed a requirement that prisoners exhaust all adequate state remedies as a precondition to invoking federal judicial relief. "It would wholly frustrate explicit congressional intent," the Court explained, "to hold that the respondents in the present case could evade this requirement by the simple expedient of putting a different label on their pleadings. In short, Congress has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, and that specific determination must override the general terms of § 1983." *Id.* at 489–90, 93 S.Ct. 1827. Again, the court's reasoning relied on the distinction between the specific requirement of habeas exhaustion taking precedence over section 1983's general terms. *See* 411 U.S. at 489, 93 S.Ct. 1827 ("It was conceded [at oral argument] that [a state prisoner] cannot bring a § 1983 action, even though the literal terms of § 1983 might seem to cover such a challenge, *because Congress has passed a more specific act to cover that situation,*

and, in doing so, has provided that a state prisoner challenging his conviction must first seek relief in a state forum, if a state remedy is available." (emphasis added)).

Finally, the Court explained that policy considerations, particularly the need for federal-state comity in a situation in which federal courts are asked to review the actions of state officials and state courts, furthered the need to give full effect to the exhaustion requirement. *Id.* at 491–497, 93 S.Ct. 1827.

## B. *Heck v. Humphrey*

In *Heck*, the Court revisited the same territory, addressing "the question whether a state prisoner may challenge the constitutionality of his conviction in a suit for damages under 42 U.S.C. § 1983." 481 U.S. at 478, 107 S.Ct. 1862. That question, the Court maintained, was "clearly not covered by the holding of *Preiser*, for petitioner seeks not immediate or speedier release, but monetary damages, as to which he could not have sought and obtained fully effective relief through federal habeas corpus proceedings." *Id.* at 481, 93 S.Ct. 1827. *Heck* reaffirmed the rule of *Preiser* and extended it even to claims for which habeas cannot provide relief, but which nevertheless call into question the validity of a conviction.

The starting point of *Heck* was the well-established principle that section 1983 "creates a species of tort liability," *Id.* at 483, 114 S.Ct. 2364 (*citing Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 305, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986)), and that the common law of torts provides rules regarding the "elements of damages and the prerequisites for their recovery" which provide a backdrop for 1983 actions. "Thus," the Court explained, "to determine whether there is any bar to the present suit, we look first to the common law of torts." *Id.* at 483, 114 S.Ct.

2364. The Court then analogized the sort of section 1983 claim involved to a malicious prosecution claim, which, at common law, required the plaintiff to establish as an element of the tort that the prior criminal proceeding terminated in favor of the accused. This requirement avoids parallel litigation over the same issues and prevents a criminal defendant from making a collateral attack on his or her conviction through a civil suit. Reasoning that the same need for finality and consistency inheres in civil rights suits, the Court concluded that the final termination requirement was equally applicable to section 1983 actions. *Id.* at 484, 114 S.Ct. 2364 ("We think the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement, just as it has always applied to actions for malicious prosecution.").

## C. APPLICATION OF *PREISER–HECK* RULE TO RLUIPA

The court must consider what bearing the holdings of *Preiser* and *Heck*, both developed in connection with the interaction between section 1983 and habeas corpus, have in the context of an action alleging violations of RLUIPA, the correction of which may impact the length or duration of a plaintiff's confinement. As I now explain, defendants' argument that *Heck* bars the relief sought fails because of crucial differences between RLUIPA and section 1983.

First, plaintiffs' suit is brought under a specific Congressional enactment, RLUIPA, designed to redress the harms that result from preventing prison inmates from exercising their religion. The statute's legislative history indicates that it was enacted to prevent correctional institutions from restricting "religious liberty

in egregious and unnecessary ways." 146 Cong. Rec. S7774–01 (July 27, 2000) (Joint Statement of Senators Hatch and Kennedy). The statute endows federal courts with broad remedial powers to correct such harms, and provides that the "Act shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this Act and the Constitution." 42 U.S.C. § 2000cc–3(g).

■ As explained above, the dichotomy between the broad sweep of the section 1983 statute and the specific scope of the habeas statutes was central to the Court's reasoning in *Preiser*. *Preiser* held that the specific remedy of habeas corpus was the appropriate vehicle for attacking the validity of the fact or length of confinement and that "that specific determination must override the general terms of § 1983." 411 U.S. at 490, 93 S.Ct. 1827. Here, however, the situation is reversed: RLUIPA addresses a much more specific problem than the habeas statutes and, within that specific area, erects no exhaustion barrier and gives courts the power to remedy wrongs.

Second, to the extent that both *Preiser* and *Heck* are based on a comparison between habeas and the general tort regime of section 1983, the comparison is inapplicable here. In particular, *Heck*'s analogy between section 1983 actions and common law malicious prosecution claims simply has nothing to do with a claim under a specific modern civil rights statute designed to apply in the prison context. This fact alone makes clear that *Heck* is irrelevant to today's decision.

■ Finally, had Congress intended for habeas exhaustion requirements to limit relief under RLUIPA, Congress could surely have so indicated. The federal courts need not import such a requirement and, indeed, must especially decline to do

so given RLUIPA's command that the Act "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this Act and the Constitution." 42 U.S.C. § 2000cc–3(g). Confronted with the choice between a specific Congressional enactment and a judge-made rule that might be read to conflict with the statute, a federal court is bound to follow the clear intent of Congress. *See Nev. Dep't of Human Resources v. Hibbs,* 538 U.S. 721, 123 S.Ct. 1972, 1977, 155 L.Ed.2d 953 (2003). Indeed, in the context of religious exercise, the Court has invited the political branches to provide greater protection for religious exercise through legislation. *See Employment Division v. Smith,* 494 U.S. 872, 890, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); *Madison v. Riter,* 355 F.3d 310, 314–15 (4th Cir.2003). As Senator Kennedy, one of RLUIPA's sponsors, explained, RLUIPA "reflects our commitment to protect religious freedom and our belief that Congress still has the power to enact legislation to enhance that freedom, even after the Supreme Court's decision in 1997 that struck down the broader [RFRA]." 146 Cong. Rec. S7774–01 (July 27, 2000).

*Heck, Preiser,* and their progeny, therefore, do not preclude the relief requested by plaintiffs here.

## VIII.

### CONCLUSION

For the foregoing reasons, the court hereby ORDERS as follows:

1. Plaintiffs' motion for summary judgment and permanent injunction is GRANTED.

2. Defendants are PERMANENTLY ENJOINED as follows:

a. Defendants may not impose any form of discipline on the plaintiffs, or cause them to forfeit or be denied the opportunity to earn sentence-reducing credits, based on plaintiffs' attendance at Jumu'ah services.

b. Defendants may not impose any form of discipline on plaintiffs for wearing half-inch beards for religious purposes.

3. The court specifically finds that foregoing the relief afforded extends no further than necessary to correct the threat to plaintiffs' rights under RLUIPA and, accordingly, that it is narrowly drawn and the least intrusive means necessary to correct the harm. *See* 18 U.S.C. § 3626(a)(1).

4. The parties are ORDERED to MEET AND CONFER concerning the appropriate means of locating and expunging plaintiffs' disciplinary records in accordance with the principles outlined in this order and consistent with 18 U.S.C. § 3626(a)(1). The parties SHALL FILE a joint proposed order addressing this issue not later than thirty (30) days from the effective date of this order. Should the parties fail to reach agreement on the matter, the parties SHALL FILE separate proposed orders not later than thirty (30) days from the effective date of this order.

IT IS SO ORDERED.